IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

PARIS LAPRIEST POWELL,                    )
                                          )
            Petitioner,                   )
                                          )
vs.                                       )      Case No. CIV-00-1859-C
                                          )
MIKE MULLIN, Warden, Oklahoma             )
      State Penitentiary,                 )
                                          )
            Respondent.                   )

**MEMORANDUM OPINION**

Petitioner, a state prisoner currently facing execution of a sentence of death, appears

with counsel and has filed his *Petition for Writ of Habeas Corpus By a Person in State*

*Custody Pursuant to 28 U.S.C. § 2254* (hereinafter "Petition"), challenging his conviction

in the District Court of Oklahoma County.  Respondent has responded to Petitioner's

Petition, the state court record has been supplied, and Petitioner has replied.[1]

**History of the Case**

Procedural History

Petitioner was convicted by a jury in the District Court of Oklahoma County, State

of Oklahoma (Case No. CF-93-3926) of one count of first degree malice aforethought murder

for the shooting death of Shauna Farrow and one count of shooting with intent to kill for the

shooting of Derrick Smith.  The jury found the existence of one aggravating circumstance -

_____

[1] The trial transcript shall be cited as (Tr., Vol. __, p. __.).  The original record shall be cited
as (O.R. at __.).

knowingly creating a great risk of death to more than one person - and returned a recommendation of a sentence of death for the murder and a sentence of life imprisonment for the shooting.

After denial of relief on direct appeal and on post-conviction in state court, Petitioner filed his Petition with this Court asserting twenty-two separate grounds for habeas relief. Included in those grounds were two related and intertwined grounds for relief: (1) that his convictions were obtained upon evidence known by the prosecution to be false in violation of Napue v. Illinois, 360 U.S. 264 (1959), and the Fourteenth Amendment, and (2) that additional suppression of exculpatory evidence rendered his convictions unconstitutional. These claims originated from affidavits executed in 2001 and 2002 by Derrick Smith, the prosecution's key witness at trial. The affidavits recanted his trial identification testimony of Petitioner (and also of Yancy Douglas) as one of the shooters and his identification of the car from which the shots were fired. Petitioner also supported his claims with affidavits of two other witnesses who attested that they were threatened and intimidated by the prosecutor (Brad Miller) to testify falsely in their identification of the car used in the shooting as the car in which they had previously seen Yancy Douglas. The Court entered an Order on December 2, 2002, holding the case in abeyance pending exhaustion of these and other grounds for relief contained in the Petition.[2]

_____

[2]  The Order held the case in abeyance pending exhaustion in state court of the claims determined to be unexhausted (Grounds 1, 2, 4, 5, and 6) and the claims containing new "bits" of evidence (Grounds 3, 10, 13, 14, and 16).

On remand, the Oklahoma Court of Criminal Appeals (OCCA) applied its Rule 9.7(G)(3) and denied review of Petitioner's claims. After supplemental briefing by the parties on the adequacy of the state's procedural rule, the Court entered its Order determining the state's procedural bar to be inadequate to bar review under these circumstances. *Petitioner's Motion for Partial Summary Judgment on Grounds One and Two and Request to Hold Remainder of Claims in Abeyance Pending Appeal* (Dkt. No. 150) was denied. Petitioner's request for discovery and for an evidentiary hearing was granted as to his first two grounds for relief only. The Court held an evidentiary hearing on the first two grounds for relief in conjunction with an evidentiary hearing in the case of <u>Douglas v. Mullin</u>, CIV-02-101-C.

<u>Factual History</u>

Under 28 U.S.C. § 2254(e), when a federal district court addresses "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). For the purposes of consideration of the present petition, this Court provides the following synopsis from the OCCA's published opinion, summarizing the evidence regarding the shooting and Derrick Smith's identification of Petitioner presented at Petitioner's trial.

On June 25, 1993, two youths were gunned down in a drive-by shooting on Southeast 22nd Street in Oklahoma City. Fourteen year old Shauna Farrow died at the scene when a bullet penetrated her chest and passed through her heart and lungs. Seventeen year old Derrick Smith was shot in the hip, resulting in extensive injuries to his leg. He was placed in a body cast, and his leg injury required the permanent placement of a metal rod and pin.

Derrick Smith had known Appellant for six or seven years and was in contact with him every day for about eighteen months prior to the shooting. Smith was not a friend of Appellant, nor did Smith even like him. Smith had also known Yancey Douglas for about eight years and saw him every day. Douglas used to stay with Smith's aunt from time to time.

At the time of the incident, Smith was a member of the Southeast Village Crips (SEV). Appellant and Douglas were members of the 107 Hoover Crips. The SEVs and the 107 Hoovers are not rival gangs; they help each other out on occasion when there is a dispute with another gang. However, Smith claimed the two gangs were locked in a dispute in June of 1993. Carlos Morris, a 107 Hoover, had been shot and killed by Valdez Wilburn, an SEV, two weeks earlier.

Smith testified that on the day of the shooting, he went to the Ambassador Courts Apartments to hang out with his friends, smoke marijuana, and sell crack. This was apparently Smith's normal daily routine. At the time, he was carrying crack cocaine on his person and a .380 caliber automatic pistol. Smith testified he was not particularly concerned about the dispute between his gang and the 107 Hoovers because he had still been hanging out with Yancey Douglas.

Upon arriving at the apartments, Smith smoked between eleven to fifteen marijuana cigarettes, and he also drank some Everclear alcohol. He testified he was intoxicated, "somewhat" high and drunk, but not out of touch with reality. He recalled how he and a friend had been talking with Shauna Farrow.

At about 11 p.m., Shauna left the apartments and began walking home. Smith joined her, pushing along his little sister's ten speed on the way. Smith testified there were numerous street lights in the area.

Just before arriving at his home on Southeast 22nd street, a car approached Shauna and Smith from behind, heading east. Smith recalled

hearing a song coming from the car, a song he associated with Yancey Douglas. Smith testified it was an old song by Ice Cube that Yancey Douglas used to listen to and like. Smith described the car as a gray hatchback, possibly a Datsun. He identified State's exhibit 2, a photograph of a blue Dodge Omni, as the car he saw.

As the car passed, Smith could not see any faces inside. He only saw shadows. The car went over a hill and turned around. Smith saw the car's headlights reflect off a house as it turned. The car pulled up to Smith and Shauna and then stopped. After a pause of two or three seconds, the driver's door opened up and Smith recognized Appellant and Yancey Douglas. Douglas was sitting in the passenger seat, and Appellant was driving. Smith also saw a shadow of another passenger from the back seat. At that point, lights of fire jumped out of the car from the hands of the car occupants. Smith said he was immediately hit by one of the gunshots, estimating there had been some fourteen or fifteen shots. He heard bullets whizzing by his ears. Smith lay on the ground, pretending he was dead. As the car drove off, Smith heard a high-pitched voice similar to Douglas's voice say, "fuck 'em."

Smith attempted to crawl away from the scene, leaving his 2.5 gram bag of crack cocaine behind in the process. Neighbors assisted him. Meanwhile the car drove up several houses, and the doors opened. Smith said it looked as though the car had changed drivers. Smith threw his gun over a fence. The gun was never located.

During cross-examination, defense counsel brought out some inconsistencies between Smith's trial testimony and his previous statements. At the preliminary hearing, Smith testified the car had a little ruffle in the back and on the sides. During trial, he said there was no ruffle in the back. Smith initially told an officer the gray two-door hatchback was followed by a beige car, possibly a Grand Prix. Smith also told one officer he was only fifty percent sure Appellant was the driver of the car. Smith admitted telling Joanne Marie Paul he could not tell who was in the car that night. Further, Smith admitted he had given an incorrect statement regarding seeing Appellant and Anthony Highsaw in the hatchback on previous occasions.

\* \* \*

A.L. testified that on the day before the shooting, she was with her sister and two friends at the Ambassador Courts Apartments. Her two friends were members of the SEV Crips. Sometime after ten, A.L., her sister, and her

5

two friends were walking to A.L's grandmother's house when she heard Yancey Douglas approach in gray two-door car.  A.L. knew Douglas because he used to live with her.  She heard someone in the car say, "there go them SEV niggers."  A.L. saw Douglas pointing a gun out the window toward the ground.  He said, "Them is Nut's sisters, put the guns up."  A.L.'s friends took off running.  A.L. identified the car depicted in State"s exhibit 2 as the car she saw that evening.

Powell v. Oklahoma, 2000 OK CR 5, 995 P.2d 510, 517-19.

Findings of Fact

From the evidence presented and the testimony received at the evidentiary hearing, the Court finds the following as facts pertinent to the determination of the claims raised by Petitioner.

1.     Shauna Farrow was killed and Derrick Smith was shot on June 24, 1993.

2.     In an unrelated case, Derrick Smith pled guilty on February 1, 1994, and received a sentence of ten years in CF-92-6772.  The plea was part of a plea bargain in which his trafficking charge was reduced to Possession with Intent and a prior charge of throwing an object from a moving vehicle (CF-93-6724) was dismissed.

3.     On June 2, 1994, Derrick Smith was released on pre-parole status under the supervision of the Department of Corrections.

4.     On September 6, 1994, Derrick Smith was arrested for receiving stolen property and was re-incarcerated on October 4, 1994, at Ardmore CTC.

5.     On May 25, 1995, Brad Miller wrote a note in the District Attorney's file stating he had spoken to Derrick Smith on the murder case.  (Pet. Ex. 39.)

6.     Yancy Douglas's jury trial began June 20, 1995.

6

7.      Derrick Smith testified in the Douglas trial on June 22, 1995.

8.      On June 23, 1995, Writs of Attachment were issued for Jackie Laster and Andrea Laster for failure to appear on June 22, 1995, as per subpoena. (Pet. Ex. 16 and 17.)

9.      At the conclusion of both stages of Yancy Douglas's trial, the jury recommended death on July 6, 1995, for the murder of Shauna Farrow.

10.     On July 7, 1995, Brad Miller wrote a letter to the Oklahoma Pardon and Parole Board. The letter noted Derrick Smith's incarceration for a ten-year sentence for Possession of Cocaine with Intent to Distribute, and outlined a brief description of the facts of the shooting of Derrick Smith and the murder of Shauna Farrow. The letter concluded:

> As you can see by the sentence Derrick received, this office gave him no special treatment in his case. However, he was required to testify at preliminary hearing and the trial of Yancy Douglas. He has done so without complaint. In fact, he has fully cooperated and truthfully testified in both instances. He did so in the face of repeated threats, both direct and indirect, from gang members. This has occurred on the street and in prison.
>
> Derrick stood up like a responsible citizen during the Douglas trial, which only concluded yesterday. He was motivated to assist because of the wrongness of Shawna's death. Without Derrick, Douglas would probably not have been convicted. Douglas was sentenced to death by the jury for his part in Shawna's murder. Derrick understands that he will be required to testify in Paris Powell's trial in September.

I have no agreements with Derrick.  However, I have spent many hours with him.  He is not a perfect citizen.  However, based on my experience with him, I believe he has earned an opportunity to reintegrate into society.  Ideally, he will be paroled to another state to live with family.  On the short term, I urge the Board to grant his pre-parole status.

Thank you for undertaking your difficult tasks.  If I can provide further information or be of assistance, feel free to call.

(Pet. Ex. 2A.) (This letter was first obtained by Petitioner's counsel on March 26, 2004, from the Oklahoma County District Attorney's Office case file:  *State of Oklahoma v. Paris LaPriest Powell and Yancy Douglas*, CF-93-3926.)

11.      On October 24, 1995, Derrick Smith was granted pre-parole status and released.

The following events began almost two (2) years after the conclusion of Yancy Douglas's trial and continued during and after Petitioner's trial:

12.      On April 9, 1997, subpoenas were issued and served on Andrea Laster, Jackie Laster, and Tiffany Laster in Judge Black's courtroom, first ordering them to appear on April 23, 1997 (Pet. Ex. 24, 26, and 28), and also ordering them to appear and testify at Petitioner's trial on May 5, 1997.  (Pet. Ex. 23, 25, and 27.)

13.      On April 20, 1997, Derrick Smith wrote a letter to his mother.  The envelope listed his return address as an inmate at McAlester, Oklahoma, Department of Corrections.

What's up Momma?  Have you been calling Cuz?  Probably not man call O Dude and get that hook up to where I can come home from the county jail or tell him he's short because I ain't gone let him put me in the cross again like he did last time, but he ain't gone to do shit if ya don't continue to call him and let him know what's going on, it's fifteen days before the trial starts and I don't wanna be up in that county jail if he ain't talking write.  Tell'em I want

8

365 days for helping the state to kill some body cause that's what he plans to do.  Plus send me some money daddy was suppose to have sent 25 dollars 3 months ago & nigga ain't got no money but Ima let you'll go.  Stay own brad miller and I'll Holler at you'll later.  Love darric.

(Pet. Ex. 2B.) (This letter was first obtained by Petitioner's counsel on March 26, 2004, from the Oklahoma County District Attorney's Office case file: *State of Oklahoma v. Paris LaPriest Powell and Yancy Douglas*, CF-93-3926.)

14.　　On April 23, 1997, a telephone call note reflects a phone call was placed to Brad Miller from Marcella Traywicks (Derrick Smith's aunt).  Although Marcella Traywicks believes she did not make that call, her testimony was that her sister, Derrick Smith's mother, often used her phone and her name when doing so.  On the note Brad Miller wrote "Warden Ron Ward" and "Derrick Smith," and notes "coop credits" and "with credits ➜225 days = 11/11/97."  (Pet. Ex. 2C.)  These notes memorialize a telephone call he had with David Petite, sentence administration auditor at the Department of Corrections.  (This note was first obtained by Petitioner's counsel on March 26, 2004, from the Oklahoma County District Attorney's Office case file: *State of Oklahoma v. Paris LaPriest Powell and Yancy Douglas*, CF-93-3926.)

15.　　On or about April 30, 1997, material witness arrest warrants for Andrea Laster and Jackie Laster were filed that had also been previously issued by the district court on April 9, 1997.  (Pet. Ex. 21 and 22.)

16.　　On May 1, 1997, Petitioner's trial began, ending on May 20, 1997, with the jury recommending a sentence of death for the murder of Shauna Farrow.

17.     On June 22, 1997, Derrick Smith wrote a letter to Warden Bobby Boone inquiring if Brad Miller had contacted him about 200 merit days and 400 lost credit days. (Pet. Ex. 1B.)

18.     On June 27, 1997, Warden Bobby Boone responded by letter to Derrick Smith. The letter stated that Warden Boone had been called by Brad Miller regarding Mr. Smith's situation, but that Mr. Miller was mistaken and meritorious earned credit was not intended as a reward for testifying in a felony case.  (Pet. Ex. 1C.)

19.     In August of 1997, Derrick Smith was discharged from the Department of Corrections.

20.     Derrick Smith was arrested for the October 17, 1997, shooting of Joe Shells and was charged with Assault with a Dangerous Weapon, CF-98-1545.  On July 30, 1998, the case was orally dismissed by Brad Miller.  On August 18, 1998, the case was formally dismissed by Brad Miller for the stated reason of insufficient evidence of identification.  (Pet. Ex. 3.)

21.     On February 16, 1998, a drive-by shooting was allegedly committed by Derrick Smith as per the information filed in CF-98-1162.  On September 28, 1998, the charges were dismissed due to uncooperative victims.

22.     On May 17, 1999, Derrick Smith allegedly committed an assault and battery with a dangerous weapon.  He was later convicted of beating Amber McPherson with a baseball bat on January 22, 2001, case number CF-99-3338, and sentenced on March 14, 2001, to fifteen years.

23.    On March 8, 2000, Derrick Smith was arrested for trafficking in crack cocaine. On March 16, 2000, Derrick Smith and Andrea Laster were charged in case CF-00-1683. On October 24, 2000, Mr. Smith's attorney learned of a five-year deal in that case to run concurrently with a fifteen-year sentence in case number CF-99-3338.  On January 4, 2001, Andrea Laster received a deferred sentence.  On March 21, 2001, Derrick Smith received a five-year sentence to run concurrently with the fifteen-year sentence in CF-99-3338.

24.    On June 10, 2000, a murder was committed in Wichita Falls, Texas.  Derrick Smith was arrested on a Texas murder warrant on July 20, 2000, while in the Oklahoma County jail.  He was indicted for the murder on October 18, 2001.  On December 18, 2002, he pleaded guilty to an amended charge of aggravated robbery and received a twelve-year, six-month sentence to run concurrently with any sentence imposed by the State of Oklahoma.

The following testimony was received at the evidentiary hearing held in this case and in the related case of Douglas v. Mullin, CIV-02-101-C.  Evidence was presented and testimony was received through fifteen witnesses.  Of primary importance to the issues before this Court was the testimony of Derrick Smith and Brad Miller (the prosecuting attorney in Petitioner's trial and in the trial of Yancy Douglas).[3]

_____

[3]  Andrea Laster and Jackie Laster also testified at the evidentiary hearing in support of Petitioner's claim that Mr. Miller coerced false testimony at trial regarding the identification of Petitioner in the car used in the shooting.  Jackie Laster did not testify at Petitioner's trial, but both testified at the evidentiary hearing that they were arrested and held in jail in an attempt to make them testify falsely.  Although this testimony is offered in support of Petitioner's claims, it will not be specifically addressed herein.  The testimony of Derrick Smith and Brad Miller are of primary importance to Petitioner's claims.  Derrick Smith is the lynchpin to Petitioner's claims on habeas, just as he was in the identification and conviction of Petitioner at trial.  The testimony of the Laster sisters will, however, be taken into consideration by the Court in its determination, as well as the

25.     Derrick Smith executed his first affidavit on May 17, 2001.  It is a handwritten affidavit recanting his trial testimony identifying Petitioner and Yancy Douglas as the shooters, recanting his identification of the vehicle from which the shots were fired, and recanting his trial testimony denying any deals or special consideration in exchange for his testimony.  (Pet. Ex. 4, Attachment A.)  On May 24, 2001, Mr. Smith executed a second affidavit essentially identical to the first.  (Pet. Ex. 1.)  On January 17, 2002, Mr. Smith executed a third affidavit confirming his trial testimony and recanting his previous affidavits. (Pet. Ex. 5.)  On May 16, 2002, Derrick Smith executed yet another affidavit, recanting his recantation contained in the third affidavit, contending investigators for the State of Oklahoma threatened him with perjury charges if he did not "take back" what he had said in the first two affidavits.  (Pet. Ex. 6.)

26.     Derrick Smith testified that everything in the handwritten affidavit dated May 17, 2001 (Pet. Ex. 4, Attachment "A"), was true.  He stated he was unable to identify anyone in the car on June 25, 1993, because he was high on marijuana, drunk on Everclear (grain alcohol), and because it was dark outside.  He attributed his initial identification of Paris Powell to the police officers as a statement based on what someone said at the scene, and not on his own identification.  He stated he told Brad Miller that he could not identify either defendant and that he would not testify unless Mr. Miller helped him on his pending drug trafficking case.  According to Mr. Smith, Mr. Miller told him that if he would testify and

testimony of all the witnesses presented by the parties.

identify Yancy Douglas and Paris Powell, Mr. Miller would assist him after the trials were over.

27.     Derrick Smith also testified that his trial testimony in both trials identifying Petitioner and Yancy Douglas as two of the individuals shooting from the car, identifying the car in the photo, and denying any deals or requests for assistance with the prosecution in exchange for his testimony were all false.  He stated he did not see who was in the car or who shot him and Shauna Farrow, but that it could not have been Petitioner or Yancy Douglas because they were "innocent."

28.     Brad Miller testified that his first contact with Derrick Smith was before the preliminary hearing in Petitioner's and Yancy Douglas's case, and that Mr. Smith has never told him that he could not identify the people in the car from which the shots were fired. Although deals between a prosecutor and a witness in exchange for testimony were very normal, Mr. Miller stated that Mr. Smith told him he did not want a deal because he didn't want to be a "snitch."  According to Mr. Miller, Mr. Smith never asked him for any help, there was no deal when he put Mr. Smith on the stand, and there never was a deal with Mr. Smith for his testimony.

29.     To Brad Miller's knowledge, Mr. Smith was unaware of the letter Mr. Miller wrote to the Pardon and Parole Board immediately after Yancy Douglas's trial requesting that it grant Mr. Smith pre-parole status.  Mr. Miller testified he was trying to help Mr. Smith because he respected him for testifying, and any such letter was not part of any deal for Mr.

13

Smith's testimony.  In his opinion, assistance of that nature need not be disclosed to the defense.

30.     Mr. Miller did not recall the specific <u>Brady</u> motion filed by the defense in Petitioner's case, but he was certain that he read it.  The motion specifically requested disclosure of documents of impeaching nature regarding any and all consideration of promises or consideration given to or on behalf of a witness, whether bargained for or not. It included recommendations or assistance with respect to any pending or potential criminal parole or probation.  Even in the event his letter might have helped Mr. Smith, Mr. Miller did not believe he had a duty to disclose the document or any such assistance under <u>Brady v. Maryland,</u> 373 U.S. 83 (1963).

31.     On March 16, 2000, Derrick Smith was charged with trafficking in crack cocaine.  Although Mr. Miller was in private practice and no longer working as an assistant district attorney, he contacted the prosecuting attorney in the District Attorney's office and informed him that Mr. Smith had testified as a witness in two murder cases.

32.     Attorney Martin Ozinga was appointed to represent Petitioner at trial.  At the time of the evidentiary hearing he had no recollection of looking at the District Attorney's files.  He cannot absolutely deny it, however, if Brad Miller remembered him looking at the files a few months before trial.  In his opinion, Brad Miller's letter to the Pardon and Parole Board and Mr. Smith's letter to his mother are material required to be disclosed pursuant to <u>Brady</u>.  He testified he never saw either letter until the day before he testified at the evidentiary hearing.

14

33.     Attorney Robert Mildfelt represented Petitioner at trial.  He also could not recall if he reviewed the District Attorney's file.  He testified that had he seen the letter to the Pardon and Parole Board, as well as the other letter, he would have recognized it as Brady material.

**Grounds for Relief**

Grounds One and Two.

As previously stated, Petitioner's first two grounds for relief are related and intertwined, as they both require and rely on the same factual allegations of Derrick Smith's false testimony at trial and the existence of a deal or arrangement for assistance with the prosecutor in exchange for Mr. Smith's testimony.  Petitioner claims: (1) that his convictions were obtained upon evidence known by the prosecution to be false in violation of Napue and the Fourteenth Amendment, and (2) that additional suppression of exculpatory evidence rendered his convictions unconstitutional.

In Napue, the prosecuting attorney promised a key witness that if he testified against the defendant, a recommendation for a reduction of the witness's sentence would be made and, if possible, effectuated.  The witness's testimony was the primary identification testimony and extremely important due to eyewitness identification difficulties of other witnesses.  Based largely on this witness's testimony, the defendant was found guilty and sentenced to 199 years.  On cross-examination, the witness testified he had not been given a reward or a promise of a reward for testifying.  On re-direct, the assistant state's attorney elicited the same false answer.

The Supreme Court first stated it was well established that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." Id. at 269 (citations omitted). The same result occurs when the state, although not soliciting the false evidence, allows it to go uncorrected when it is presented. Id. This is true even if the false testimony goes only to the credibility of the witness, as the defendant's life or liberty may depend on something as subtle as the possible interest of the witness. Id.

In Brady, the Supreme Court held that suppression of favorable evidence by the prosecution after request by the accused violates due process, irrespective of the good faith or bad faith of the prosecution, where the evidence is material to either guilt or to punishment. Id., 373 U.S. at 87. That duty of disclosure was extended even when the accused had not made a request, United States v. Agurs, 427 U.S. 97, 107 (1976), and encompasses impeachment evidence as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676 (1985). The evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682.

In Kyles v. Whitley, 514 U.S. 419 (1995), the Supreme Court explained a prior holding that "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. at 433 (quoting Bagley, 473 U.S. at 682). The Supreme Court emphasized four aspects of

16

materiality under <u>Bagley</u>.  First, the touchstone of materiality is a "reasonable probability" of a different result.  The question is "whether in its absence [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  <u>Kyles</u>, 514 U.S. at 434.  Second, it is not a sufficiency of evidence test, but a showing "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  <u>Id.</u> at 435.  Third, "once a reviewing court applying <u>Bagley</u> has found constitutional error there is no need for further harmless-error review."  <u>Id.</u> at 435.  The fourth and final aspect of <u>Bagley</u> materiality "is its definition in terms of suppressed evidence considered collectively, not item by item."  <u>Id.</u> at 436.

In <u>Strickler v. Greene</u>, 527 U.S. 263 (1999), the Supreme Court explained the standards and components of a <u>Brady</u> violation:

> There are three components of a true <u>Brady</u> violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

<u>Id.</u> at 281-82.

"[W]hen 'the reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the] general rule [of <u>Brady</u>]."  <u>Scott v. Mullin</u>, 303 F.3d 1222, 1231 (10th Cir. 2002) (citations omitted). "[I]mpeachment <u>Brady</u> material will only require a new trial 'if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" <u>Id.</u> at 1232 (citation omitted).  "As we stressed in <u>Kyles</u>:  '[T]he adjective is important.  The question is not

whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" Strickler at 289-90 (quoting Kyles, 514 U. S. at 434)..

At Petitioner's trial, Derrick Smith was questioned by the state on direct examination regarding the shootings, his identification of Petitioner, and his identification of the vehicle from which the shots were fired.   Brad Miller also questioned Mr. Smith regarding his incarceration at the time of trial on a ten-year sentence for possession with intent to distribute.  (Case No. CF-92-6722.)  Mr. Miller asked Mr. Smith the following in reference to any agreements or deals in exchange for his testimony in Petitioner's case:

> Q.      All right.  Did you receive any benefit, any sort of help on that case as a result of what happened to you in this case?
> MR. MILDFELT:   Your Honor, if the Court please. That's premature unless I try to impeach him.
> THE COURT:  Go ahead.
> Q.      (By Mr. Miller):  Go ahead.
> A.      No, I didn't.
> Q.      All right.  Did I handle your dope case?
> A.      No, you didn't.
> Q.      Do you know if anybody - - did you have a lawyer in that case?
> A.      Yes, sir.
> Q.      Do you remember his name?
> A.      Hurst Jones, I think.
> Q.      Hurst Jones?
> A.      I think that's it.
> Q.      All right.  Did Hurst Jones get any benefit as a result of what happened to you in this case, if you know.
> MR. MILDFELT:  Your Honor, if the Court please, may we approach?
> THE COURT:  Yeah.[4]

---

[4] Petitioner's counsel objected to the state's attempt to bolster the witness on the grounds the information was not relevant to his credibility, stating it was only relevant if Petitioner's counsel

* * *

Q.  (By Mr. Miller):  Were you aware of any discussions that Hurst Jones, your lawyer, had in trying to work out your case that you're incarcerated for, any discussions that he had trying to use this case as any benefit in that process?

A.  No, sir.

* * *

Q.  All right.  And at any time - - at any time during this pendency of the case or the time that you received, did you ever request any help as a result of this case?

A.  No, sir.

(Tr., Vol. V, pp. 1066-69.)

In his closing argument, Mr. Miller made the following comments:

He went to prison on his own case and never asked for a thing. Contemplate what you heard.  He got a ten year to do sentence at 17 years of age for having some cocaine on him.  He got whacked.  And nobody interceded because he didn't want it that way.

MR. MILDFELT:  Your Honor, if the Court please, there's no evidence period what he wanted or any of that.

MR. MILLER:  Yeah, it is, Judge.

THE COURT:  Overruled.  He talked about that, about no deal, and that's a reasonable inference.  Overruled.

(Tr., Vol. VII, p. 1612.)[5]

---

attempted to impeach the witness regarding a deal for his testimony.  Counsel's objection and motion for mistrial were overruled.

[5] In the trial of Yancy Douglas, Derrick Smith testified on direct examination he had not had any discussions with the prosecution about what should happen in his own criminal case and that he had not received any special treatment.  (Douglas Tr., Vol. III, pp. 720-22.)  On cross-examination, Douglas's trial counsel specifically inquired about any deal with the prosecution or consideration in exchange for his testimony.  (Douglas Tr., Vol. III, pp. 845-51.)  On redirect, Derrick Smith testified he had never asked for any help with his own criminal case.  (Douglas Tr., Vol. III, p. 867.)

In the instant case, the Court finds the veracity of each of the primary witnesses who testified at the evidentiary hearing to be highly suspect. Derrick Smith repeatedly changed his testimony several times by affidavit prior to the evidentiary hearing in an apparent, and possibly successful, attempt to obtain the greatest benefits for himself. Brad Miller's statements denying any deal or promises in exchange for Derrick Smith's testimony is contradicted by Mr. Miller's letter to the parole board, Mr. Smith's letter to his mother, and Mr. Miller's conversation with David Petite regarding "coop credit," for Derrick Smith immediately before trial.

Review of the facts convinces the Court that Derrick Smith's testimony at Petitioner's trial regarding no help or assistance with his ten-year sentence was false. Initially, Brad Miller asked Mr. Smith if he had "received any benefit, any sort of help on that case as a result of what happened to you in this case?" Mr. Smith replied: "No, I didn't." It is undisputed that Brad Miller had written a letter to the Pardon and Parole Board requesting that it grant Mr. Smith pre-parole status. That letter set forth the facts of the shootings and the prosecutor's opinion that Yancy Douglas's conviction was primarily the result of Derrick Smith's testimony. Mr. Miller stated that although Derrick Smith was not a perfect citizen, he believed Mr. Smith had "*earned* an opportunity to reintegrate into society." (emphasis added). Both the letter and Mr. Miller's opinions are clearly "any sort of help" given "as a result of what happened" to Mr. Smith in Petitioner's case - the very type of help set forth in Petitioner's <u>Brady</u> motion. Mr. Smith denied the help, and Brad Miller did not correct his response.

Although it is possible Derrick Smith was unaware of this letter at the time of Petitioner's trial, he undoubtably was aware of the letter he had written to his mother approximately two weeks prior to Petitioner's trial requesting her to continue contacting Brad Miller. Derrick Smith was asked on direct examination by Mr. Miller if at any time he had ever requested any help as a result of Petitioner's case. Mr. Smith responded that he had not. This statement was obviously false, as he had told his mother to tell Brad Miller that he wanted 365 days for helping the state by testifying. The Court concludes that the April 23, 1997, telephone call note in the prosecutor's file regarding "coop credits" and Mr. Miller's telephone conversation with David Petite demonstrate Mr. Miller's knowledge that Mr. Smith's denial of any requests for assistance was false. Mr. Smith's false testimony, and Mr. Miller's acquiescence in Mr. Smith's responses, deterred any potential inquiry into Mr. Smith's personal interest or bias.

Derrick Smith's untruthful testimony regarding the absence of any deals, assistance, or requests for assistance was further emphasized by Brad Miller in his closing argument. Mr. Miller stated when arguing about Derrick Smith's sentence: "He went to prison on his own case and never asked for a thing." Mr. Miller added: "And nobody interceded because he didn't want it that way." Derrick Smith's credibility is paramount in consideration of Petitioner's claims. Just as his credibility is presently of utmost importance, however, it and a potential personal stake in the trial was undeniably an even greater concern at the time of his testimony at trial. Although the Court has serious doubts regarding the recantations of his identification of Petitioner and Yancy Douglas, the facts convince the Court that, at a

21

minimum, Mr. Smith utilized his identification testimony in an effort to benefit himself, Mr. Miller was aware of Mr. Smith's requests for assistance, had acted on his request, and that this information was not known by or conveyed to Petitioner's trial counsel.  The credibility and personal bias of a witness, most certainly an eyewitness of such singularly primary importance as Mr. Smith, is greatly material to the life or liberty of a defendant, especially when combined with various questionable aspects of Mr. Smith's testimony inquired into on cross-examination.

Additionally, the Court finds that the failure of the prosecutor to provide copies of the letter to the Pardon and Parole Board and Derrick Smith's letter to his mother, as well as the failure to inform the defense of that information and Mr. Miller's conversation with David Petite regarding "coop credits" for Derrick Smith, constitute a violation of <u>Brady</u>.  Mr. Miller's responses at the evidentiary hearing regarding his opinions pertaining to the duty to disclose were not in conformity with the duties and responsibilities of a prosecutor as dictated by <u>Brady</u> and its progeny.  The letter to the Pardon and Parole Board was specifically addressed by Petitioner's <u>Brady</u> request, as it requested any and all evidence pertaining to a witness with respect to pending or potential criminal parole or probation. Whether or not this evidence had been requested by Petitioner's counsel, Mr. Miller was obligated and had a duty to disclose.  The evidence was material to impeachment of Derrick Smith's credibility and was evidence of his potential personal stake in the outcome of Petitioner's trial.  It was further paramount to contradict Mr. Miller's closing argument bolstering Mr. Smith's credibility.  The letter requesting the Board to grant Mr. Smith pre-

22

parole status and detailing his primary involvement in the conviction of Yancy Douglas, Mr. Smith's letter to his mother asking her to contact Brad Miller again for assistance in exchange for his testimony, and Mr. Miller's conversation with David Petite shortly before trial, when taken in conjunction with Mr. Smith's previous identification and testimonial inconsistencies, lends itself to a reasonable probability of a different result had it been disclosed to the defense.

The Court recognizes that "review of a death sentence is among the most serious examination any court of law ever undertakes." Brecheen v. Reynolds, 41 F.3d 1343, 1370 (10th Cir. 1994). Derrick Smith was the only eyewitness to the murder of Shauna Farrow and to his own shooting, and his identification of Petitioner was the linchpin to a conviction. Despite the Court's concerns regarding recanted testimony and self-serving statements by witnesses at the evidentiary hearing, Petitioner has presented sufficient facts to demonstrate the existence of a deal, assistance, or request for assistance in exchange for testimony that was not disclosed to the defense. He has also presented sufficient facts to demonstrate that Mr. Smith's trial testimony denying any such requests for assistance was false, and that such testimony was known to be false by the prosecutor. Under the facts demonstrated by Petitioner, the Court finds that Petitioner's trial did not result in a verdict worthy of confidence.

After a complete and thorough review of the transcripts, trial record, appellate record, record on post-conviction, the supplemental briefs filed by the Petitioner and Respondent, the applicable law and the testimony and evidence presented at the evidentiary hearing, the

Court finds that Petitioner's *Petition for Writ of Habeas Corpus By a Person in State Custody Pursuant to 28 U.S.C. § 2254* should be and hereby is CONDITIONALLY GRANTED as to his First and Second Grounds for relief.  Petitioner's remaining grounds for relief are rendered moot by the conditional relief granted by the Court on the first two grounds, and are, therefore, DISMISSED WITHOUT PREJUDICE to re-raising them to this Court in the event this decision is reversed on appeal by the Tenth Circuit.  The Court orders that the State of Oklahoma be given 180 days from the date of this Opinion to commence a new trial.  Failure to commence such a proceeding within 180 days from the date of this Opinion shall result in this Court's vacation of Petitioner's convictions and sentences and Order that Petitioner be released from custody.  Any remaining motions are moot.

IT IS SO ORDERED this 31st day of January, 2006.


ROBIN J. CAUTHRON
United States District Judge